UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

     v.

JOSE FRANCISCO TEHOVNIK,

          Defendant.

_____

**25-CR-189-JLS**

**SENTENCING MEMORANDUM AND
CHARACTER LETTERS**

**<u>INTRODUCTION</u>**

Mr. Tehovnik's early life demanded more than we can ask of any child. He was born in an impoverished Brazilian town to parents who, beyond abusing him, were wholly indifferent to his existence. Abused, abandoned and responsible for his younger brother, he ended up in nightmarish orphanage. While he was eventually adopted and later brought to the United States, those experiences stopped Mr. Tehovnik from growing into the man he could have been. They weighed him down every day. Instead of adapting to his new life, he couldn't sleep. He had night terrors. He had panic attacks. He was depressed. And he felt alone. In these low moments, he found solace in the relationship at this case's heart.

He understands that this relationship was wrong and illegal, as were his actions to continue it. Still, this crime came from a broken and lonely young man, not someone sexually attracted to children or interested in doing this again. Mr. Tehovnik remains willing and able to

continue to work through his past, and he has the help of a committed and supportive family. In this context, a sixty-month sentence is sufficient, without being greater than necessary.



*Mr. Tehovnik (bottom left) with his parents and brother*

**Exhibit A**:    **Letter from Ana Baez**

**Exhibit B:**    **Letter from Andrea Flores de Silva and Felipe Abramvezt**

**Exhibit C:**    **Letter from Arlete Tehovnik**

**Exhibit D:**    **Letter from Edward Tehovnik**

**Exhibit E:**    **Letter from Gustavo**

**Exhibit F:**    **Letter from Henrique Sanches**

**Exhibit G:**      **Letter from Isoralti Cardoso**

**Exhibit H:**      **Letter from Marta Cristina Cocco Bludeni**

**Exhibit I:**       **Letter from Rogerio Lopes**

**Exhibit J:**       **Letter from Samuel Tehovnik**

**Exhibit K:**      **Mindful Behavior Mental Health Records (filed under seal)**

**Exhibit J:**       **Certificates**

## PROCEDURAL HISTORY

Mr. Tehovnik was charged by complaint with sexual enticement of a minor in violation of 18 U.S.C. § 2242(b), production of child pornography in violation of 18 U.S.C. § 2251(a), receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A), and possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

Following several adjournments of the Fed. R. Crim P. 48(b) date, Mr. Tehovnik pleaded guilty to a one-count information charging him with receipt of child pornography. Dkt. 29. The parties calculated the Guideline Sentence as 151 to 188 months but reserved the right to request a non-guideline sentence. Dkt. 30 at ¶¶ 16-17.

A revised presentence reported calculated the same recommended sentence. Dkt. 37 (PSR) at ¶ 63. Neither party objected.

## ARGUMENT

Macaiba—Mr. Tehovnik's birthplace—lies in Brazil's northeast. It is one of approximately 150 municipalities in the state of Rio Grande do Norte. Around his birth year, poverty was common. Approximately 40% of Rio Grande do Norte's population lived in extreme poverty, meaning they could not afford to "purchase a minimum food basket of 2288 calories per day for each household member." Brazil County Management United, *Brazil Growth and Poverty Reducation in Rio Grande do Norte: A State Economic Memorandum*, World Bank (January 16, 2004), *available at* https://openknowledge.worldbank.org/server/api/core/bitstreams/49ca1973-1eab-50b5-b99d-d54e04e55e0c/content.

Mr. Tehovnik was a part of that 40%. His existence was about survival, not growth or being a child. Day to day, he did not know what he would eat. He barely had a home and was

forced to live on the streets during the day. He did not go to school. His father describes Mr. Tehovnik's early life as a "horse-and-buggy existence" and "extreme poverty." Ex. D. The situation worsened when his brother Samuel was born when Mr. Tehovnik was seven, as there were even more mouths to feed.

And he had to navigate these challenges on his own. He never knew his biological father. That man left Mr. Tehovnik's life before he was a year old. His mother did not care for him. She was frequently drunk and did not provide basic necessities, like food and clothes. Mr. Tehovnik find that for himself on the streets.

Her choice in men made the situation worse. She cycled through partners, some boyfriends and others who paid her for sex. Not only did a six-year-old Mr. Tehovnik see his mother prostitute herself, but some of these men also abused him. One made him kneel on rocks. Another beat him and his mother approximately 15 times. Another beat him so badly that he had to go to the hospital. He was not even nine years old yet.

Mr. Tehovnik also looked after his younger brother Samuel. Even though Samuel was just a baby, his mother essentially ignored him. These responsibilities—such as changing Samuel's diaper and finding food for him—fell onto Mr. Tehovnik's seven-year-old shoulders. Per Samuel:

> We were born in Natal, Rio Grande do Norte, Brazil. Francisco is seven years older than me. When I was born, he was only 7 years old, but he still took care of me like a little parent. From what my family has told me, he helped feed me, change me, and do the basic daily care a baby needs. That continued until I was about 2 years old, when we were both enrolled in a local orphanage.

Ex. J.



*Mr. Tehovnik (left) and Samuel*

Around 2009, authorities learned about the neglect and abuse Mr. Tehovnik experienced. While this addressed an immediate concern, his mother's legal custody of him was terminated and it introduced a host of other problems. Specifically, he was forced into an orphanage, a place he described as "hell."  PSR at ¶ 79.

The orphanage was small. Nine boys slept in Mr. Tehovnik's small bedroom -- four bunk beds and a small single bed for Samuel (who was 1-3 years old at the orphanage). Although Mr. Tehovnik received basic food and clothes, the staff was, at best, indifferent. Mr. Tehovnik describes it as closer to a juvenile detention facility than someplace designed to help children. He had no freedom. He did not receive any education, and the staff did nothing to address the abuse that he had suffered and was suffering at the orphanage.

At the orphanage, Mr. Tehovnik missed his mother deeply. Although not an ideal mother, he was still a ten-year-old boy, and she was (at that point) the only person he could call a parent. One day she was in his life, and the next day he did not see her again. No one there helped him

with that transition. In fact, Mr. Tehovnik was actively abused by other boys. The orphanage did not have private bathrooms. Older boys sexually assaulted Mr. Tehovnik multiple times. Needless to say, the orphanage did nothing to address this problem or its impact.

In 2012, Mr. Tehovnik and his brother were adopted by Edward and Arlete Tehovnik, the brothers' current parents. They rescued Mr. Tehovnik and welcomed him (and Samuel) into their family. They offered their love and support, something Mr. Tehovnik will be eternally grateful for. He loves them deeply and bristles at any suggestion that they are not his parents. When recounting the difficulties Mr. Tehovnik faced after his adoption, he wants the Court to know his gratitude toward them and the mutual love in his family. He cannot imagine his life without them.

To facilitate with the transition, the new family remained in Brazil. At this time, Mr. Tehovnik was a 10-year-old child who, instead of having any schooling or childhood, had spent his life with impoverished or abusive parents or in an orphanage. The family focused on providing a loving and stable home while helping Mr. Tehovnik begin catching up on schooling.

Already, impacts from Mr. Tehovnik's childhood began to emerge. He could not read or write. His mother noted that Mr. Tehovnik was affectionate but had difficulty with anxiety, tantrums, organization, and concentration. Even removed from the orphanage, he could not get a peaceful night of sleep and often screamed or jumped in his sleep. A Portuguese language evaluation done during this transition time said that Mr. Tehovnik suffered from insecurity, need for security, impulsivity, and feelings of inferiority. It also noted that Mr. Tehovnik has difficulty making decisions with serious emotional consequences.

In 2017, the family relocated to the United States. External factors, namely deteriorating conditions in Brazil, drove that decision:

7

> birth. We as a family continued to live in Brazil until 2017 before moving to the United States: conditions in Natal had become unsafe due to a crime wave and we wanted to secure a better future for our sons by having them naturalized in the United States. We settled in Orlando, Florida.

Ex. D.

As his father mentioned, Mr. Tehovnik became a naturalized United States citizen:



*Mr. Tehovnik (right) and his brother after naturalization*

The move to the United States made Mr. Tehovnik's transition into his new life even more difficult. His mother wrote:

> When we moved to the United States in December 2017, he entered the final year of middle school and then high school with limited English. Despite the language barrier and the difficulty of adapting, he worked hard and managed to do well. He also volunteered in the community, including at Goodwill, Nona Church, dog walking in our neighborhood, and local food banks.

Ex. C.

His lack of formal education, combined with the difficulties inherent in moving to a new country that speaks a different language, made school difficult. He tried hard, and often did well in classes like history but had difficulty with math and science. Ultimately, he fell 1 credit hour short of graduating high school, missing half a credit in economics and half a credit in performing arts.

After high school, he consistently worked. He preferred jobs that often utilized his language skills as well as his work ethic. His father describes Mr. Tehovnik working in restaurants, and Mr. Tehovnik describes working as an Amazon delivery driver. Ex. D; PSR at ¶ 87.



*Mr. Tehovnik before going to work at a restaurant*

Still, the past continued to haunt him. His childhood had forced him to grow up in some depressing ways. But, it other ways, it stunted his development. Mr. Tehovnik's vulnerability and immaturity. From a family friend:

> We are certain that any mistake he may have made was due to a lack of maturity, and this experience will surely serve to mature him and provide a lesson he will carry with him for the rest of his life.

His mother:

> As a teenager and young adult, Francisco has consistently been affectionate, respectful, and hardworking. He has long carried a strong desire to build his own life and eventually his own family, seeking stability and belonging. I believe that desire, combined with immaturity and unresolved emotional pain, contributed to poor decisions with serious consequences. At the same time, I believe he is capable of learning from this and living responsibly with the right structure and treatment.

Ex. C.

And his grandmother:

> I have always admired his effort, his dedication, and his kind heart. Even as an adult, Francisco always maintained an innocent, pure, and sometimes even a little immature way – but always true, always authentic, always himself.

Ex. G.

In 2023, he began attending counseling at Mindful Behavioral Healthcare in Florida. He described anxiety. He could not sleep because he was having panic attacks every night. His past manifested as nightmares. He would daydream and have auditory hallucinations of people asking for help:

Ex. K.

Not only were these symptoms similar (although more intense) to the symptoms reported after his adoption, but they also related to his past life on the streets and in the orphanage:

*Id.*

He was put on several different medications for a variety of diagnoses, including primary insomnia, chronic PTSD, binge eating disorder, severe major depressive disorder, generalized anxiety disorder, and panic disorder. *Id.*

A follow-up appointment revealed Mr. Tehovnik continued to "experience persistent symptoms" despite the medication. He was now sleeping 12-14 hours a day and still feeling exhausted. He dealt with racing thoughts and feeling overwhelmed and stressed. *Id.* This lack of progress, combined with the symptoms themselves, led Mr. Tehovnik to stop this treatment.

This was how Mr. Tehovnik was when he began his relationship with MV1. He was 21 years old. He was grateful for his new life. Still, he was being torn apart by his old life. He felt anxious. He felt depressed. He felt isolated. He felt guilty. In MV1, he thought he had found his answer.

His decision to pursue this relationship did not reflect someone who had a longtime interest in underage women. It does not show Mr. Tehovnik will engage in similar behavior in the future. It shows just how profoundly confused and disoriented he was, as well as how desperate he was to escape that. His feelings can be seen in text messages, which reveal an

11

desperate and intense infatuation, not a sophisticated predation. It can be seen in his messages with MV1's parents, in which he tried to explain that they were kindred spirits because he saw echoes of his own trauma in her.

Understanding Mr. Tehovnik's past and mental health matters. Mr. Tehovnik recognizes that he is asking the Court to impose a sentence below the guidelines. But the guidelines are "neutral as to [Mr. Tehovnik's] race, sex, national origin creed and socioeconomic status." USSG § 1A1.1. Nor do they consider his education, vocational skills, family ties, responsibilities and community ties. *Id*. These factors separate Mr. Tehovnik from most other people convicted of this offense and help explain why the offense occurred. Yet the guidelines essentially acknowledge that they do not consider them when recommending a sentence.

As the law and the guidelines acknowledge, that job belongs to the Court. *See* 18 U.S.C. § 3553(a); USSG § 1A1.1 Commentary Background. Still, when the Court considers the recommended sentence—as required by law—it should also consider that the guidelines do not account for what makes Mr. Tehovnik and the case's context unique.

The Court should also consider that Mr. Tehovnik remains able to overcome his past. While his childhood created enormous challenges, it also revealed a basic truth. He will persist. He did not give up when he was an eight-year-old living on the streets caring for himself and his brother. He did not give up when he was a ten-year-old in an orphanage that he called a "hell." PSR at ¶ 79. That spirit helped him get through Brazil, regardless of how damaged he emerged.

It will continue to help him after this sentencing. He will fight to rebuild, and in some respects build for the first time, his life following the case. Despite the challenges, including the ones he may have imposed on himself, he remains a good person who wants to be a part of a better world.

Numerous people describe this spirit in their letters. His brother Sam wrote about how, as previously discussed, Mr. Tehovnik looked after him as almost a father when Mr. Tehovnik was seven years old and how, even as Mr. Tehovnik struggled with his own demons, spent meaningful time with his brother:

> Growing up, Francisco always made time for me. When he started working, he would take me out to eat sometimes, or we would go to the movies. He also took me fishing, which he loved because he enjoys being outdoors and around nature. Those are some of my best memories with him.

Ex. J.

Similarly, a friend writes about how Mr. Tehovnik went out of his way to help his transition to the United States, even as Mr. Tehovnik had difficulty with his own:

> Francisco quickly became a close friend. We often ran into each other at school, and since we took the same bus, we usually walked home together. After classes, whenever we were free, we spent time at the pool, used the computers in the clubhouse, or played pool together. Those simple moments made my transition to a new environment much easier and far more positive.

Ex. F.

His experience of being charged and convicted has pushed him to make necessary changes. This was the first time he spent time in jail, and he has spent 20 months there pending sentencing. As the attached certificates show, he has taken numerous classes, including classes relevant to this offense like critical thinking, decision-making, and stress management. Deprivation of freedom has given him clarity and taught a lesson that will not need to be taught again: he must resolve the damage that his past caused, and it must be a priority.

Before this case, Mr. Tehovnik did not wish to dwell on the past if he did not have to. When he did not experience fast results and dealt with uncomfortable medication side effects, he

did not continue with the 2023 treatment. Likewise, his family wanted to spare him the pain of reliving that past. His mother writes a raw confession about that:

> Francisco's early childhood was marked by instability and emotional hardship. After he joined our family, he received psychological support. I will also be honest about my own shortcomings: in my desire to protect him from further pain, and because I lacked the maturity and perspective I wish I had then, I focused on moving forward and avoided revisiting the past, hoping that would reduce his pain. I now understand that for a child who has lived through that kind of experience, emotional wounds can remain even in a stable and loving home.

Ex. C.

Mr. Tehovnik did not understand how broken his past had left him. Not only did the symptoms (especially anxiety and depression) make it harder for him to gather himself and restart treatment, but they also hindered self-reflection about his depression and its depth. He did not fully understand what was happening to him or the consequences of trying to ignore it.

Everyone understands, most of all Mr. Tehovnik, understands he must proactively address this past. He began to do that at the jail. Although NEOCC offers limited mental health resources, he has sought them out. He has reported recurring issues with anxiety, depression, and nightmares of childhood abuse and sought medication. Throughout his discussions with counsel in this case, he has become more open in talking about his past and his mental health. He knows that time and distance alone will not heal these wounds.

Upon his release, he will be a part of a welcoming and supportive family. His mother describes how his family will help him:

14

> Our family's plan is as follows:
> - Stable housing at the address above, with clear rules and supervision.
> - Transportation and scheduling support to ensure he attends all court obligations, probation requirements, and appointments.
> - Professional counseling focused on decision-making, boundaries, and emotional regulation; we will arrange intake immediately and ensure consistent attendance.
> - Daily structure, including employment or approved education/training, compliance with any curfew and restrictions, and limited environments consistent with supervision terms.
> - Accountability and cooperation: we will cooperate fully with probation, provide verification of appointments or work if required, and support any monitoring ordered by the Court.

*Id.*

Fashioning a sentence that prioritizes this type of rehabilitation will be beneficial because Mr. Tehovnik has a character worth saving and fighting for. A family friend describes him as kind, helpful, and pleasant:

> José was always an extremely kind, helpful, and pleasant boy. We never witnessed any inappropriate behavior. On the contrary, he was a special child, as he was always very polite and attentive.

Ex. B.

His cousin describes how he feels remorse:

> *I know Francisco made a serious mistake, and I understand that what he did was wrong. He has taken responsibility for his actions and has shown real remorse. Francisco calls my mom every week, and through those calls I have seen how much he reflects on his choices. He talks about what he did wrong, what he has learned, and his strong desire to do the right thing when he gets out.*

Ex. E.

Another family member writes about how Mr. Tehovnik helped him through a serious illness:

15

> In that same period, we were renovating our place in Florida, and I became seriously ill. It was a very difficult time for me and for my family. Francisco helped us a lot. He came many times to help with practical things, like carrying heavy materials, moving things, and doing small tasks that I could not do because of my health. He never complained. He was always willing to help when we asked. For me, this showed a young man who cares about family and who is ready to support others when they need it.

Ex. I.

Other sentencing factors support a sixty-month sentence. While this memorandum detailed Mr. Tehovnik's personal history, it does not mention his criminal history. That is because he has no criminal history. He did not commit similar offenses in the past, and he is not predisposed to commit them in the future. While not undermining the severity of his crime here, it helps prove that his actions did not come from an innate criminality. A sixty-month sentence reflects that history while protecting the public from any future crimes Mr. Tehovnik will not likely commit.

A sentence seeking to provide Mr. Tehovnik with the most effective educational/vocational training and medical care will also not unduly emphasize incarceration. Mr. Tehovnik needs treatment to learn to live with his past trauma. That will best allow his character to shine through. He will not receive the treatment he needs in the Bureau of Prisons. He will receive it outside -- which the Court can guarantee through conditions of supervised release -- and he will have the help of his family.

Mr. Tehovnik understands he committed a serious crime. He asks that the Court impose a serious penalty: sixty-month sentence for someone with no criminal history. That sentence balances the need to punish Mr. Tehovnik with the understanding that his past played, his remorse, his youth and immaturity, and low chance of recidivism.

**DATED**:                Buffalo, New York, March 3, 2026.

                                Respectfully submitted,

                                **/s/  John J. Morrissey**
                                John J. Morrissey
                                Assistant Federal Public Defender
                                Federal Public Defender's Office
                                300 Pearl Street, Suite 200
                                Buffalo, New York 14202
                                (716) 551-3341, (716) 551-3346 (Fax)
                                John_Morrissey@fd.org
                                Counsel for Defendant


**TO:**    Evan Glaberson
           Assistant United States Attorney

           Maria Meck
           United States Probation Officer